# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| MARIO L. SIMS, SR.;<br>TIFFINY SIMS; and<br>T.C., a minor child, by his parents as<br>next friend and guardian,<br><br>     **Plaintiffs,**<br><br>    **v.**<br><br>HUMANE SOCIETY OF ST. JOSEPH<br>COUNTY INDIANA INC.;<br>CYNTHIA MILLER, President, Humane<br>Society of St. Joseph County Indiana Inc.;<br>ELLEN SCHOTT, Secretary, Humane<br>Society of St. Joseph County Indiana Inc.;<br>CAROL ECKER, Director, Humane<br>Society of St. Joseph County Indiana Inc.;<br>DOUGLAS A. HOEFFLER, Owner,<br>Parrett Veterinary Clinic;<br>KATHY MATTERN,<br>Parrett Veterinary Clinic,<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 3:09 CV 585<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION and ORDER

## I.    INTRODUCTION

This matter is before the court on two motions to dismiss. (DE ## 11, 16.)

Plaintiffs Mario L. Sims, Tiffiny Sims, and T.C., a minor child by his parents as next

friends and guardians (collectively the "plaintiffs"), filed a *pro se* complaint alleging that

they were discriminated against on the basis of their race during the process of

attempting to adopt a pet from a local animal shelter. The defendants in this case can be

usefully separated into two groups. The first group consists of the Humane Society of

St. Joseph County Indiana Inc.; its president, Cynthia Miller; its secretary, Ellen Schott; and its director, Carol Ecker (collectively the "Humane Society defendants"). The second group consists of Douglas Hoeffler, owner of the Parrett Veterinary Clinic; and Kathy Mattern, an employee of the same (collectively the "Parrett defendants"). Each group has filed its own motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). For the reasons set forth below, the defendants' motions are granted in part and denied in part.

## II.    BACKGROUND

For purposes of deciding the present RULE 12(b)(6) motions, the court accepts the following facts, as they were alleged in the complaint, as true. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). On Thursday, December 17, 2009, plaintiffs, who are African-Americans, went to the Humane Society of St. Joseph County to adopt a pet. (Compl. ¶ 9.) Plaintiffs found Gabby, an English Mastiff puppy, that was available for adoption. (Compl. ¶ 10.) A kennel worker advised plaintiffs that the Humane Society was fully aware of Gabby's physical condition and that she was in excellent health. (Compl. ¶ 11.)

Plaintiffs proceeded to the front office to begin the adoption process. (Compl. ¶ 10.) They noticed that the front office staff did not include any African-Americans, nor did any African-American customers enter during the hour while they were there. (Compl. ¶ 12.) There were numerous white customers that came in who were greeted warmly. (Compl. ¶ 12.) Plaintiffs overheard the front office staff telling white patrons that although there were deficiencies in their paperwork, the staff would speak to the

committee responsible for approving the adoption to iron out issues so they would be able to adopt. (Compl. ¶ 13.) At some point a white staff member was made aware that plaintiffs had been waiting for quite a while and the staff member glared in a hostile manner and did not respond. (Compl. ¶ 14.) Plaintiffs noticed that the staff appeared more willing to serve white patrons than them. (Compl. ¶ 14.)

Eventually a staff member accepted the adoption application completed by plaintiff Tiffiny Sims and told Tiffiny someone would call her the next day. (Compl. ¶ 15.) On the way home, plaintiffs discussed their belief that the Humane Society staff appeared racially hostile and that the Humane Society would find a pretextual reason to deny plaintiffs' application to adopt Gabby because plaintiffs were African-Americans. (Compl. ¶ 15.) Because Gabby was a pure bred, expensive dog, plaintiffs felt the Humane Society would try to ensure that a white person adopted Gabby. (Compl. ¶ 15.)

The next day, a woman identifying herself as Brooke from the Humane Society called Tiffiny and asked Tiffiny if she was still with her husband and married to him. (Compl. ¶¶ 16-18.) Tiffiny stated that she was married to Mario and that the two of them, plus their son, had come to the Humane Society. (Compl. ¶¶ 18-19.) Tiffiny asked Brooke what that had to do with the adoption process. (Compl. ¶ 19.) Brooke then told Tiffiny that plaintiffs were not approved to adopt Gabby because it was possible that Gabby could develop hip dysplasia. (Compl. ¶ 20.) Tiffiny told Brooke that the kennel worker at the Humane Society had informed plaintiffs that Gabby was in excellent health. (Compl. ¶ 21.) Brooke responded that while Gabby was healthy, there was a

chance that Gabby could develop hip dysplasia and that it could cost $6,000 to treat it. (Compl. ¶ 22.) Tiffiny informed Brooke that plaintiffs owned two acres of land where Gabby would get plenty of exercise and that plaintiffs' household income was in excess of $100,000 so they could afford the required treatment. (Compl. ¶ 23.) Tiffiny asked Brooke how she could know that plaintiffs could not afford Gabby's treatment if the Humane Society never inquired about plaintiffs' income, and Brooke did not respond. (Compl. ¶ 23.)

After Tiffiny's conversation with Brooke concluded, Mario called Brooke. (Compl. ¶ 24.) Mario told Brooke that he had raised show dogs and could pay for any necessary treatments for Gabby. (Compl. ¶ 25.) Mario also told Brooke that the Humane Society's animal control officers had visited plaintiffs' home twice after reports of animal mistreatment, and that on both occasions the officers determined that those allegations were unfounded. (Compl. ¶ 25.) Brooke then stated that Gabby's potential surgery played no role in the decision to deny plaintiffs' adoption application; rather, the application was denied because the Humane Society had been told by the Parrett Veterinary Clinic that plaintiffs only provided minimal care to their pets. (Compl. ¶ 26.)

Mario, perhaps surmising that Parrett's "minimal care" comment had to do with plaintiffs' failure to spay another dog they owned, asked Brooke whether the Humane Society knew that plaintiffs had scheduled that dog to be spayed three times, but that each time the procedure was postponed (once because Parrett told them to wait because the dog was in heat, once because of a storm, and once because of a personal

emergency). (Compl. ¶ 27.) Brooke said Parrett had not informed her of these facts. (Compl. ¶ 27.)

Tiffiny then called Parrett and spoke to the clinic's owner, Douglas Hoeffler. (Compl. ¶ 28.) Hoeffler told Tiffiny that his employees were only supposed to say whether a pet's heartworm shots were current. (Compl. ¶ 30.) When confronted with the allegation that a Parrett employee told the Humane Society that plaintiffs' provided "minimal care" to their pets, Hoeffler told Tiffiny that was okay. (Compl. ¶ 31.)

Mario then called Parrett, where he reached Kathy Mattern, a Parrett employee. (Compl. ¶¶ 32-33.) Mario asked Mattern if she had told the Humane Society about the plaintiffs' scheduled spayings and the reasons for the cancellations; Mattern said no and spelled her name "so [plaintiffs] could 'sue her.'" (Compl. ¶ 35.)

Mario again called Brooke at the Humane Society and told her that she had not gotten all of the information from Parrett, and Brooke said she did not care. (Compl. ¶ 36.) Mario asked to speak to the director of the Humane Society, but when Brooke transferred the call it was disconnected. (Compl. ¶ 36.) Mario called again and left a voicemail for Carol Ecker, director of the Humane Society. (Compl. ¶ 37.) Ecker never returned his call. (Compl. ¶ 37.) That afternoon plaintiffs went back to the Humane Society and stated they had been the victims of racial prejudice. (Compl. ¶ 38.) Ecker ordered them to leave in a hostile manner. (Compl. ¶ 38.)

Plaintiffs claim that, in addition to having been denied the adoption of Gabby, they have suffered emotional harm and trauma, pain and suffering, and loss of

enjoyment of life. (*See, e.g.*, Compl. ¶ 52.) Plaintiffs also seek compensation for present and future expenses for treatment of psychological manifestations of mental anguish, other expenses, and costs. (*See, e.g.*, Compl. ¶ 52.)

## III.    LEGAL STANDARD

Plaintiffs' complaint contains nine[1] counts, in which plaintiffs allege violations of federal and Indiana law. Because plaintiffs appear *pro se*, their filings are "to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (quotation marks and citations omitted).

Defendants argue that plaintiffs' complaint should be dismissed under RULE 12(b)(6) for failure to state a claim for which relief may be granted. RULE 8 of the FEDERAL RULES OF CIVIL PROCEDURE requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "The Rule reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (internal quotation marks omitted). For decades courts had determined the sufficiency of complaints under RULE 8 by employing the oft-cited

---

[1] The final count of plaintiffs' complaint is labeled "XI," suggesting that the complaint contains eleven counts. However, the complaint does not include a count "V," but rather skips from count "IV" to count "VI"; it also does not include a count "VIII," but rather skips from count "VII" to "VIIII [sic]." Therefore, the complaint contains only nine counts. In this opinion the court uses the same roman numerals that appear in plaintiffs' complaint to refer to the various counts.

test of *Conley v. Gibson*, in which the Supreme Court stated that a complaint satisfies RULE 8 "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957).

However, the Court changed the landscape of pleading standards in *Bell Atlantic Corp. v. Twombly,* holding that while "we do not require heightened fact pleading of specifics," a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" to the level of "plausible." 550 U.S. 544, 555, 570 (2007). In other words, the complaint must contain "enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Id.* at 556. However, the Court clarified that it was not imposing a probability requirement on plaintiffs, because "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely," so long as the plaintiff has "nudged their claims across the line from conceivable to plausible." *Id.* at 556, 570. The Court reiterated the plausibility standard in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Notably, the plausibility standard applies even to allegations regarding states of mind. *Iqbal,* 129 S. Ct. at 1952 (dismissing complaint because it "does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind").

In a recent opinion on this subject, the Seventh Circuit embraced a narrow reading of the plausibility standard set forth in *Twombly* and *Iqbal,* cautioning that "'[p]lausibility' in this context does not imply that the district court should decide

whose version to believe, or which version is more likely than not." *Swanson v. Citibank,*

*N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "[T]he [Supreme] Court is saying instead that the

plaintiff must give enough details about the subject-matter of the case to present a story

that holds together. In other words, the court will ask itself *could* these things have

happened, not *did* they happen." *Id.* at 404 (emphasis in original).

## IV. DISCUSSION

### A. Plaintiffs' Sections 1981 & 1982 Claims

In Counts I and II, plaintiffs allege that defendants violated their rights under

Title 42, Sections 1981 and 1982 of the United States Code. Section 1981 states that "[a]ll

persons within the jurisdiction of the United States shall have the same right . . . to make

and enforce contracts . . . as is enjoyed by white citizens." To establish a prima facie case

of discrimination under Section 1981, a plaintiff must allege: (1) he is a member of a

racial minority; (2) the defendants had the intent to discriminate on the basis of race;

and (3) the discrimination concerned the making or enforcing of a contract.

*Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006).

Section 1982 states that "All citizens of the United States shall have the same

right . . . as is enjoyed by white citizens . . . [to] purchase . . . personal property." To

establish a violation of § 1982, a plaintiff must demonstrate: (1) interference with

property rights, which interference is (2) motivated by racial prejudice. *Lac Du Flambeau*

*Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse - Wis., Inc.*, 991 F.2d 1249, 1257

(7th Cir. 1993). Both statutes ultimately require proof of discrimination on the basis of

race. *Cartwright v. Am. Sav. & Loan Ass'n,* 880 F.2d 912, 927 (7th Cir. 1989). "Because of their common origin and purpose, § 1981 and § 1982 are generally construed in tandem." *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir. 1996).

Based on the complaint, plaintiffs appear to allege: (1) that the Humane Society defendants denied their pet adoption application because of plaintiffs' race; and (2) that the Parrett defendants made statements to the Humane Society that interfered with their potential pet adoption because of plaintiffs' race. Defendants argue that plaintiffs have failed to adequately allege facts from which a court could infer racial discrimination, given the standards articulated in *Twombly* and *Iqbal*.

In *Swanson,* a recent[2] Seventh Circuit opinion already discussed briefly above, the court held that the plaintiff's discrimination complaint satisfied RULE 8 because it identified the type of discrimination the plaintiff thought occurred (racial), by whom (a bank), and when (in connection with her efforts to obtain a home equity loan). 614 F.3d at 405. According to the Seventh Circuit, "[t]his was all that was needed to put in the complaint." *Id.* The *Swanson* court elaborated by providing an example of discrimination allegations that would satisfy RULE 8: "A plaintiff who believes that she has been passed over for a promotion because of her sex will be able to plead that she was employed by Company X, that a promotion was offered, that she applied and was qualified for it, and that the job went to someone else. That is an entirely plausible

---

[2] *Swanson* was decided on July 30, 2010, six months before the issuance of this opinion. 614 F.3d at 400.

scenario, whether or not it describes what 'really' went on in this plaintiff's case." *Id.* at 404-05. Under *Swanson,* a plaintiff alleging discrimination need only allege "how, in the plaintiff[s'] mind at least, the dots should be connected" to comply with *Twombly* and *Iqbal. Swanson,* 614 F.3d at 407.

Given the Seventh Circuit's decision in *Swanson,* the court must conclude that plaintiffs' claim is plausible, at least against some of the defendants, because it sets forth a discrimination scenario that *could have* happened. Whether plaintiffs were really unable to adopt a dog because of their race is not yet known, but the Humane Society *could have* denied plaintiffs' adoption application on the basis of race, and the Parrett defendants *could have* interfered with plaintiffs' attempted adoption on the basis of race.

Defendants point out that in *Twombly,* the Court held that a complaint was deemed insufficiently pleaded when alleged conduct "was not only compatible with, but indeed was more likely explained by lawful . . . behavior." *Iqbal,* 129 S. Ct. at 1950 (paraphrasing *Twombly*). Indeed, one facet of the court's holding in *Twombly* was that the plaintiffs' allegations of parallel conduct on the part of telecommunications companies did not plausibly suggest a conspiracy existed between them because the behavior could be explained by an "obvious alternative explanation." *Twombly,* 550 U.S. at 567. The Court stated that government-sanctioned monopolies were the historical norm in the telecommunications industry, and present-day companies, having been born into that world, were "sitting tight, expecting their neighbors to do the same

thing." *Id.* at 567-68. Thus, the facts alleged suggested only parallel conduct and not the existence of an agreement. *Id.* at 568.

Two years later in *Iqbal,* the Court reiterated the idea of "obvious alternative explanations." In that case, the Court considered allegations that the FBI detained thousands of Arab Muslim men because of their race, religion, or national origin. *Iqbal,* 129 S. Ct. 1937. The Court reasoned that because the terrorist attacks of September 2001 were presumably orchestrated by al Qaeda, which is largely Arabic in membership, the group of individuals suspected of being involved in the attacks necessarily would be largely Arabic as well. The Court embraced *Twombly's* plausibility standard, holding: "As between that 'obvious alternative explanation' for the arrests, *Twombly, supra,* at 567, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* at 1951-52.

These parts of *Twombly* and *Iqbal* were not addressed in detail in the majority opinion in *Swanson.* However, Judge Posner emphasizes them in his dissent, suggesting that the complaint in *Swanson* should have been dismissed because an obvious alternative explanation for the sequence of events was apparent. Swanson received an appraisal of $170,000 on a home that she estimated was worth $270,000 and that a later appraiser found to be worth $240,000. Swanson posited that the cause for the egregiously low appraisal from Citibank was her race. According to Judge Posner, it was apparent from the plaintiff's complaint that the low home value appraisal that lead to the rejection of her home equity loan application was more likely the result of a

mistake in the appraisal process than the result of invidious discrimination. Judge

Posner suggested that more facts, such as allegations that white applicants were treated

more favorably or that Citibank engaged in a pattern of discriminatory behavior, would

have allowed a court to infer that race played some part in the decision-making. In

Judge Posner's opinion, the Supreme Court's new approach "requires the plaintiff to

conduct a more extensive precomplaint investigation than used to be required."

*Swanson,* 614 F.3d at 412 (Posner, J., dissenting).

Were Judge Posner's dissent controlling, the court might be inclined to dismiss

plaintiff's racial discrimination claims in this case. It seems more likely that plaintiffs'

application for animal adoption from the Humane Society was rejected because the

Humane Society questioned plaintiffs' ability to adequately care for an animal based on

information it received from plaintiffs' veterinarian, rather than because plaintiffs were

African-Americans. However, the majority opinion in *Swanson* has expressed how it

intends for *Iqbal* and *Twombly* to be interpreted with regard to claims of discrimination,

and has made it clear that it will not uphold trial court decisions that echo Judge

Posner's reading of the cases. For this reason, the court follows the Seventh Circuit's

majority opinion in *Swanson* and concludes that plaintiffs have stated "how, in the

plaintiff[s'] mind at least, the dots should be connected" with respect to its racial

discrimination claims under Sections 1981 and 1982 against the Humane Society and the Parrett defendants. *Swanson,* 614 F.3d at 407.[3]

However, plaintiffs have not connected the dots with respect to Miller, president of the Humane Society; Schott, secretary of the same; or Ecker, director of the same. These individuals are not liable under Sections 1981 or 1982 simply because they work for the Humane Society; personal liability under those statutes is only imposed when the person "participated in the actual discrimination" against the plaintiff. *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir. 1985). Plaintiffs have not alleged *any* facts regarding any actions or inactions on the part of Miller or Schott. As for Ecker, plaintiffs do not allege any facts from which the court can plausibly infer that she was involved in

---

[3] As Judge Posner points out, both *Twombly* and *Iqbal* are rooted concerns about "asymmetric discovery burdens and the potential for extortionate litigation . . . that such an asymmetry creates." *Swanson,* 614 F.3d at 411 (Posner, J., dissenting). Judge Posner is frank in his recognition of how the *Swanson* case would inevitably be resolved: "The plaintiff has an implausible case of discrimination, but she will now be permitted to serve discovery demands that will compel elaborate document review by Citibank and require its executives to sit for many hours of depositions. . . . The threat of such an imposition will induce Citibank to consider settlement even if the suit has no merit at all. That is the pattern that the Supreme Court's recent decisions [*Twombly* and *Iqbal*] are aimed at disrupting." *Id.* at 412.

Because the court now denies defendants' motions to dismiss in part, this case too will proceed to the discovery phase on plaintiffs civil rights claims. Given the majority's holding in *Swanson,* the only way for a defendant like the Humane Society to recoup losses incurred in defending a potentially meritless lawsuit, including the costs of discovery, will be to seek attorneys' fees. In this case, attorneys' fees are theoretically available to defendants if they prevail, given the statutes plaintiffs have sued under. *See, e.g.,* 42 U.S.C. § 1988 (allowing court to award attorneys' fees to prevailing party in action brought pursuant to Sections 1981 or 1982). However, defendants sued under other statutes where attorneys' fees are not available may not have the same opportunity to recover the costs of defending against spurious litigation.

the allegedly discriminatory decision-making process regarding the denial of plaintiffs' application. Accordingly, plaintiffs' Section 1981 and 1982 claims against Miller, Schott, and Ecker are dismissed.

### B.     Plaintiffs' Defamation Claim

In Count "VIIII [sic]," plaintiffs allege that the Parrett defendants are liable for the tort of defamation for telling the Humane Society that "the Plaintiffs only provided minimal care to their pets." (Compl. ¶ 26.) "Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind. Ct. App. 2004). A plaintiff alleging defamation must prove four elements: (1) the existence of a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Trail v. Boys and Girls Clubs of Nw. Ind.,* 845 N.E.2d 130, 136 (Ind. 2006).

In *Milkovich v. Lorain Journal Company*, the United States Supreme Court addressed the constitutional limits of state defamation laws. 497 U.S. 1 (1990). The Court stated that, under the First Amendment, a state's defamation laws may only prohibit statements that can reasonably be interpreted as stating actual facts about an individual, that is, statements that are "sufficiently factual to be susceptible of being proved true or false." *Id.* at 20, 22. The Court held that while calling someone a "liar" would constitute an actionable defamatory act, commenting on someone's "abysmal

ignorance" would constitute protected opinion. *Id.* at 20. According to the Court, the former could be proven false, while the latter could not. *Id.* at 19-20.

The Seventh Circuit Court of Appeals echoed this logic in *Sullivan v. Conway* by explaining the difference between calling someone a "poor lawyer" and stating that a lawyer should be disbarred:

> It is one thing to say that a lawyer is dishonest, or has falsified his credentials, or has lost every case he has tried, or can never file suit within the statute of limitations. These are all readily verifiable statements of fact. But to say that he is a very poor lawyer is to express an opinion that is so difficult to verify or refute that it cannot feasibly be made a subject of inquiry by a jury. . . . If Conway had said that Sullivan had been or should be disbarred, this would be actionable (if false) because it would imply that Conway knew things about Sullivan that could be shown to be either true or false, since the grounds for disbarment are factual and not mere matters of subjective opinion or surmise.

157 F.3d 1092, 1097 (7th Cir. 1998). The Seventh Circuit later elaborated that the legal test for determining whether a statement is a protected opinion is whether or not the statement implies *"objectively verifiable or testable* facts." *Pope v. Chronicle Pub. Co.,* 95 F.3d 607, 614 (7th Cir. 1996) (emphasis added). The Indiana courts have defined the common law tort of defamation in line with the Supreme Court's and Seventh Circuit's articulation of the tort's constitutional limits. *McQueen v. Fayette County Sch. Corp.,* 711 N.E.2d 62, 66 (Ind. Ct. App. 1999) (statement may be defamatory if "a reasonable fact finder could conclude that the statement implies facts which may be proven true or false").

In this case, plaintiffs allege that the Parrett defendants told the Humane Society that "the Plaintiffs only provided minimal care to their pets." (Compl. ¶ 26.) Plaintiffs have not alleged that the Parrett defendants told the Humane Society any verifiable facts about plaintiffs' care for their pets, such as whether the pets did or did not receive certain procedures. The statement that plaintiffs provide "minimal care" is analogous to a statement describing an attorney as a "poor lawyer"; neither statement is objectively verifiable. Like the word "poor," the word "minimal" is inherently subjective and its meaning could vary widely from person to person and from veterinarian to veterinarian. Because there is no way to objectively verify or test the truth or falsity of whether plaintiffs provided "minimal" care to their pets, the statement is a protected opinion and cannot constitute defamation as a matter of law. Count "VIIII [sic]" is dismissed.

### C.    Plaintiffs' Invasion of Privacy Claim

In Count X, plaintiffs allege that the Parrett defendants deprived plaintiffs of their First Amendment right to privacy. To the extent plaintiffs seek to employ the First Amendment, the claim fails. Constitutional torts are not actionable against private actors; only an entity or person acting under color of state law may be sued for violating a plaintiff's constitutional rights. *See Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994). There are no allegations that Mattern or Hoeffler were acting under color of state law; based on the allegations in the complaint, the Parrett defendants were purely private actors.

To the extent plaintiffs attempt to state a claim for the tort of invasion of privacy under Indiana law, that claim also fails. Invasion of privacy is similar to defamation but reaches different interests: defamation reaches injury to reputation, while privacy actions involve injuries to emotions and mental suffering. *Lovings v. Thomas,* 805 N.E.2d 442, 446 (Ind. Ct. App. 2004). The tort of invasion of privacy includes four distinct injuries: (1) intrusion upon seclusion; (2) appropriation of likeness; (3) public disclosure of private facts; and (4) false-light publicity. *Vargas v. Shepherd,* 903 N.E.2d 1026, 1031 (Ind. Ct. App. 2009).

The only theories that would be applicable in this case would be the latter two: public disclosure of private facts and false-light publicity. However, plaintiffs' allegations are insufficient to state a claim under either theory, because both require that information about plaintiffs was disseminated *publicly*. Public disclosure of private facts occurs when a person gives publicity to a matter that concerns the private life of another, but a communication made to a single person or to a small group of people is not actionable because the publicity element requires communication to the public at large. *Vargas,* 903 N.E.2d at 1031. Similarly, false-light publicity occurs when a matter that places an individual in a false light "is made public, by communicating it to the public at large," not just to one or a few people. *Lovings,* 805 N.E.2d at 446 (false-light claim failed where "comment was not communicated to the public at large or even to a substantial number of people"). An exception might apply where information is disclosed to a "particular public" with a special relationship to the plaintiff, such as co-

workers, family members, or neighbors. *Doe v. Methodist Hosp.,* 690 N.E.2d 681, 692 (Ind. 1997). However, in this case, plaintiffs allege that information regarding the level of care provided to their pet was disclosed only to the Humane Society, presumably only to "Brooke" but at best to the relatively small group of people that would constitute the Humane Society staff in general, and not to plaintiffs' co-workers, family members, or neighbors. Thus, plaintiffs do not allege facts plausibly establishing the tort of invasion of privacy under Indiana law. Count X is dismissed.

### D. Plaintiffs' RICO Claim

In Count XI, plaintiffs allege that defendants violated federal anti-racketeering laws in violation of 18 U.S.C. § 1961 *et seq.* (commonly known as "RICO"). RICO "has not federalized every state common-law cause of action available to remedy business deals gone sour." *Midwest Grinding Co. Inc. v. Spitz,* 976 F.3d 1016, 1025 (7th Cir. 1992). Instead, RICO is a "unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez,* 457 F.3d 703, 705 (7th Cir. 2006).

One of the elements of a RICO claim that must be alleged is a *pattern* of racketeering activity. *Slaney v. Int'l Amateur Athletic Federation,* 244 F.3d 580, 597 (7th Cir. 2001). Plaintiffs have not alleged facts allowing for an inference that defendants engaged in a pattern of racketeering activity. Plaintiffs' bald statement that a pattern existed amounts to no more than a statement of a legal conclusion and does not satisfy Fed. R. Civ. P. 8. *Iqbal,* 129 S. Ct. at 1949 (court need not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements"); *Brooks,* 578 F.3d at 581 (interpreting *Iqbal* as "admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading . . . rather than providing some specific facts to ground those legal claims"). Count XI is dismissed.

E.     **Plaintiffs' Emotional Distress Claim**

In Count VII, plaintiffs allege that defendants are liable for intentional infliction of emotional distress ("IIED"). "The intent to harm emotionally constitutes the basis for the tort of an intentional infliction of emotional distress." *Ledbetter v. Ross,* 725 N.E.2d 120, 124 (Ind. Ct. App. 2000). In other words, intent is a necessary element of the tort. *See Cullison v. Medley,* 570 N.E.2d 27 (Ind. 1991). As explained above, the plausibility standard applies even to allegations regarding states of mind, like intent. *Iqbal,* 129 S. Ct. at 1952.

Had plaintiffs alleged that the Humane Society defendants told plaintiffs they were not allowed to adopt a pet because of their race, the complaint would be closer to adequately setting forth allegations from which an intent to cause emotional harm might be inferred. But the complaint does not allege that any Humane Society employees made any race-based or otherwise hurtful remarks to plaintiffs. In fact, the complaint suggests, if anything, that the Humane Society attempted to hide their allegedly true racist motives by claiming that plaintiffs' adoption application was denied because of potential medical care costs for the dog and information the Humane Society had received from the Parrett defendants. Similarly, at best the complaint

19

alleges that the Parrett defendants tried to thwart plaintiffs' attempt to adopt a dog from the Humane Society by telling the Humane Society that plaintiffs only provided minimal care to their pets. No race-based comments on the part of the Parrett defendants were alleged in the complaint.

Even if all of the defendants were motivated by race, the complaint alleges that they attempted to hide that fact from plaintiffs. Without more, plaintiffs' allegations are inconsistent with the assertion that defendants intended to emotionally harm plaintiffs and do not allow even an inference that defendants possessed such an intent. The allegations are insufficient to state a plausible claim for IIED. Count VII is dismissed.

### F.     Plaintiffs' Negligent Supervision and Retention Claims

In Count III, plaintiffs claim that Hoeffler negligently supervised Mattern, its employee, and that the Humane Society negligently supervised Ecker, its director. In Count IV, plaintiffs allege that "defendants in ownership, senior management or supervisory role[s]" negligently retained racist employees and managers. (Compl. at 15.) Negligent retention and negligent supervision are species of negligence. *Scott v. Retz,* 916 N.E.2d 252, 257 (Ind. Ct. App. 2009). The Indiana courts have described these torts as having the same elements: 1) a duty of care owed by an employer to a third person; 2) breach of that duty; and 3) injury to the third person proximately caused by the employer's breach. *Id.*

Ordinarily, whether a duty exists is a question of law for the court to decide. *Clark v. Aris, Inc.,* 890 N.E.2d 760, 764 (Ind. Ct. App. 2008). In determining whether an

employer has a duty of care, Indiana courts apply the test enunciated in the

Restatement (Second) of Torts. *Id.* at 763. Under that test:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> > (ii) is using a chattel of the master, and
> (b) the master
> > (i) knows or has reason to know that he has the ability to control his servant, and
> > (ii) *knows or should know of the necessity and opportunity for exercising such control.*

Restatement (Second) of Torts § 317 (emphasis added). In other words, an employer is

not liable simply because an employee did something wrong; the employer must have

known (or should have known) that there was a need to prevent the harm from

occurring in the first place. As explained previously, the plausibility standard applies

even to allegations regarding states of mind. *Iqbal,* 129 S. Ct. at 1952.

Plaintiffs allege that supervisory and/or managerial defendants were negligent

in failing to be "aware of the racist attitude and racist hiring practices" (Compl. ¶ 51)

and "should have been aware of the racist policies and acted negligently by retaining

racist employees and managers." (Compl. ¶ 54.) Plaintiffs have not alleged that Miller

did or said anything, at any time, even remotely race-based; therefore the court is

unable to infer that Hoeffler knew or should have known that Mattern was allegedly racially biased.

As for the Humane Society defendants, at best, plaintiffs allege that Humane Society employees were nicer to white patrons and denied plaintiffs a dog because plaintiffs were African-American. However, plaintiffs do not allege any facts suggesting that any supervisors were aware of the employees' behavior. Nor was the alleged behavior so outward and transparent that any employer should have known that its employees would deny pets to African-American applicants simply because they were African-American. It may be *conceivable* that the upper ranks of the Humane Society knew (or should have known) that staff members were racially biased, but plaintiffs have not alleged facts that "nudge their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Because plaintiffs' complaint fails to allege facts which, if taken as true, would plausibly establish the duty element of a negligent supervision or negligent retention claim, Counts III and IV are dismissed.[4]

### G. Plaintiffs' Gross Negligence Claims

In Count VI, plaintiffs have alleged that "all Defendants" engaged in gross negligence. Negligence and gross negligence possess the same elements (duty, breach,

---

[4] In Count III plaintiffs also allege that the negligence of the Humane Society and Parrett resulted in a lack of African-Americans being employed at those establishments. It is unclear what, if any, cause of action plaintiffs are attempting to assert with these allegations, since plaintiffs have not alleged that they sought or were denied employment with either the Humane Society or Parrett. To the extent these allegations are intended to constitute a distinct cause of action, the claim is dismissed for lack of standing and/or lack of a proximately caused injury.

and injury), but the two torts have different definitions of what constitutes a "breach." *N. Ind. Public Serv. Co. v. Sharp,* 790 N.E.2d 462, 465-66 (Ind. 2003). In the case of ordinary negligence, a plaintiff must demonstrate that a defendant "merely *failed to exercise* its duty of care," while in the case of gross negligence, a plaintiff must demonstrate that a defendant breached its duty of care by "engag[ing] in a *conscious, voluntary* act or omission in reckless disregard of the consequences" to the plaintiff. *Id.* at 465 (emphasis added). However, this distinction is not very important for purposes of this analysis because, as explained below, plaintiffs fail to allege facts plausibly establishing the duty element of the claim as against any defendant.

At the outset, the court holds that any gross negligence claims that plaintiffs may be asserting related to the *supervision and/or retention of other employees* are dismissed. The court has already held that the complaint does not state a claim for ordinary negligence in connection with the supervision and/or retention of employees because no duty existed; logically the complaint does not state a claim for gross negligence on these grounds either.

The only other possible factual basis for a gross negligence claim against the Parrett defendants is the allegation that they told the Humane Society that "Plaintiffs only provided minimum care to their pets." (Compl. ¶ 26.) The court was unable to locate any previously articulated duty of care owed by a veterinarian to a pet owner regarding communications with third parties regarding the owner's history of pet care. Indiana courts determine whether to impose a duty of care by considering three factors:

(1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Clark,* 890 N.E.2d at 763.

Where there is a connection between the parties, such as between a doctor and a patient, Indiana courts have held that a "special consensual relationship" exists, indicative of a duty "premised on privity." *Webb v. Jarvis,* 575 N.E.2d 992, 996 (Ind. 1991). A veterinarian-pet owner relationship is not identical to a doctor-patient relationship, but arguably it is similar enough that the first *Clark* factor weighs in favor of imposing some duty on veterinarians. Turning to the second and third factors, the enacted public policy of the State of Indiana recognizes the sensitive nature of veterinary records and demands that veterinarians maintain those records in a confidential fashion in the absence of a pet owner's authorization. Ind. Code § 25-38.1-4-5.5 *et seq.* This law is indicative of the State's desire to protect the confidentiality of veterinary records and suggests that some injury as a result of an unauthorized disclosure is foreseeable. Accordingly, it is fair to say that veterinarians owe pet owners a duty of confidentiality with respect to an animal's medical records.

However, the complaint does not allege that the Parrett defendants disclosed any factual information to the Humane Society, only that they stated their highly subjective opinion that plaintiffs provided "minimal care" to their pets. The court is not willing to stretch Indiana's public policy principles to require veterinarians to remain silent when subjective opinions about human clients are sought by animal shelters. The importance of the safety and well-being of animals is also reflected in the policies of the state of

24

Indiana. *See, e.g.,* Ind. Code § 35-46-3-0.5 *et seq.* (setting forth criminal penalties for neglect, mistreatment, and abuse of animals). Ensuring that veterinarians and shelters are allowed to communicate in at least a limited way promotes these values. In contrast, imposing a duty of silence would function to prevent veterinarians from communicating with animal shelters entirely, even about owners who have a history of severely abusing animals.

Having carefully considered all of the *Clark* factors, the court finds that imposing no duty on veterinarians to refrain from stating an opinion about a pet owner's history of medical care to an animal shelter still recognizes the special relationship between veterinarians and pet owners by disallowing the disclosure of specific, verifiable facts including those concerning the pet's medical history. This holding also strikes a balance between Indiana public policies that simultaneously favor the confidentiality of veterinary records and the promotion of animal welfare. Further, the policy considerations that this holding promotes outweigh any foreseeable harm to pet owners that might occur in the form of the denial of a pet adoption. In sum, the court finds that the Parrett defendants did not owe a duty of care to plaintiffs to refrain from telling the Humane Society that plaintiffs provided "minimal care" to their pets. Without the existence of a duty, plaintiffs' gross negligence claim against the Parrett defendants fails.

As for the remaining defendants, the complaint fails to set forth facts from which the court could plausibly infer that any act or omission which could form the basis of a

gross negligence claim (other than negligence in the supervision or retention of employees, which the court has already addressed) was committed by the Humane Society; Miller, its president; or Schott, its secretary. The totality of plaintiffs' allegations against Ecker, the director of the Humane Society, is that Ecker failed to return their phone call and ordered them to leave the Humane Society "in a hostile manner." The court is unaware of any legal duty of care owed by a business or organization owner to return patron's phone calls or to respond to complaints in a courteous manner, and the court declines to impose one now. Accordingly, plaintiffs fail to state a necessary element of gross negligence against Ecker and the claim against her fails. In sum, plaintiffs have failed to plausibly state a cause of action for gross negligence against any defendant. Count VI is dismissed.

V.     **CONCLUSION**

For the foregoing reasons, the defendants' motions to dismiss (DE ## 11, 16) are granted in part and denied in part as follows:

The Humane Society defendants' motion to dismiss (DE # 11) is **DENIED** as to plaintiffs' Sections 1981 and 1982 claims against the Humane Society of St. Joseph County; **GRANTED** as to plaintiffs' Sections 1981 and 1982 claims against Cynthia Miller, Ellen Schott, and Carol Ecker; and **GRANTED** as to the remainder of plaintiffs' claims against the Humane Society of St. Joseph County, Miller, Schott, and Ecker. Because no claims remain against Miller, Schott, or Ecker, those defendants are dismissed entirely from this case.

The Parrett defendants' motion to dismiss (DE # 16) is **DENIED** as to plaintiffs'

Sections 1981 and 1982 claims against Douglas Hoeffler and Kathy Mattern; and

**GRANTED** as to the remainder of plaintiffs' claims against Hoeffler and Mattern.

For clarity's sake, the only causes of action that remain in this case are plaintiffs'

Sections 1981 and 1982 claims against the Humane Society of St. Joseph County,

Douglas Hoeffler, and Kathy Mattern.

**SO ORDERED.**

Date: December 22, 2010

s/James T. Moody

JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT